FILED

2024 Mar-29  AM 08:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JASON EWING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00759-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jason Ewing appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits.  Doc. 1.  Plaintiff Ewing applied for disability insurance benefits with an alleged onset date of December 1, 2017.  Doc. 12-6 at 2, 5; Doc. 12-4 at 2.  The Commissioner denied Ewing's claim for benefits.  Doc. 12-3 at 2–6, 15–26.  In this appeal, the parties consented to magistrate judge jurisdiction.  Doc. 20; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Ewing argues that the court should reverse and remand

(1) because the Administrative Law Judge (ALJ) "failed to properly evaluate Mr. Ewing's credibility," (2) because the ALJ failed to properly consider the opinion of Dr. Dallas Russell, and (3) because the ALJ failed to properly consider the opinion of occupational therapist, Retta Johnson.  Doc. 16 at 13–19.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:  (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

2

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     if not, whether the claimant has a severe impairment or combination of impairments;

(3)     if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)     if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)     if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to

show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the

Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A.    Ewing's personal and medical history

Ewing was born on October 17, 1981.  Doc. 12-6 at 2.

On December 1, 2017, Ewing reported to an emergency department in

Florida, complaining of right[1] foot and ankle pain and swelling after he stepped off a ladder during work and "felt a 'pop.'"  Doc. 12-8 at 6.  Ewing reported swelling, but did not report numbness, tingling, inability to walk, or inability to bear weight.  Doc. 12-8 at 6.  The degree of the injury at the time was classified as "minimal" and "mild."  Doc. 12-8 at 7–8.  The rest of Ewing's exam was normal.  Doc. 12-8 at 6–8.  Ewing was diagnosed with plantar fasciitis and a sprained foot and was sent home in a walking boot with a recommendation to visit a podiatrist.  Doc. 12-8 at 8–9.

Ewing also received an x-ray of his left foot and ankle on December 1, 2017.  Doc. 12-8 at 10.  Ewing's bone density was normal, his joint spaces were well preserved, and no fracture, dislocation, mass, or other osseous abnormality was evident.  Doc. 12-8 at 10.

On December 14, 2017, Ewing saw Dr. Eli Hurowitz at St. Vincent's Orthopedics in Birmingham, Alabama, complaining of heel pain in his left foot after his incident stepping off a ladder at work.  Doc. 12-8 at 206.  Ewing reported that during the incident he also fell over and injured his left wrist, which was causing him additional pain.  Doc. 12-8 at 206.  Ewing reported constant pain at a 9 out of 10 that was made worse with movement.  Doc. 12-8 at 206.  Dr. Hurowitz noted that Ewing's wrist would likely get better on its own and ordered an MRI of Ewing's

---

[1] The notes from this visit indicate that Ewing's right foot was injured, but the rest of the record shows that it was Ewing's left foot that was injured.  Doc. 12-8 at 10.

foot and ankle, noting a likely plantar fascial rupture.  Doc. 12-8 at 208.

On December 19, 2017, Ewing had an MRI of his left foot, which indicated that imaging of his plantar fascia was generally unremarkable, but that Ewing had "fairly severe proximal plantar fasciitis."  Doc. 12-8 at 15.  The MRI showed nonspecific minimal edema and otherwise "no significant findings."  Doc. 12-8 at 15.  An MRI of his ankle also showed fairly severe proximal plantar fasciitis, but showed no other significant findings.  Doc. 12-8 at 16.

On December 28, 2017, Ewing returned to see Dr. Hurowitz for a follow-up. Doc. 12-8 at 201.  Dr. Hurowitz recommended seeing a wrist specialist and diagnosed Ewing with a partial plantar fascia rupture in his foot, which Dr. Hurowitz recommended treating with conservative treatment options.  Doc. 12-8 at 202. Ewing wanted "some kind of surgery," but Dr. Hurowitz explained that surgery likely would not be helpful and that most people recovered without surgery.  Doc. 12-8 at 202.  He recommended physical therapy.  Doc. 12-8 at 202.  Ewing was limited to sedentary work.  Doc. 12-8 at 203.

Beginning in December 2017, Ewing pursued a worker's compensation claim for the December 1, 2017 foot strain injury that occurred when he stepped off a ladder and felt something pop in his left foot.  Doc. 12-6 at 11.  Ewing ultimately was paid more than $100,000 in worker's compensation for the injury.  Doc. 12-6 at 14.

On April 10, 2018, Ewing saw Dr. William Krauss at Southlake Orthopaedics Sports Medicine and Spine Center in Birmingham, Alabama, because he had been experiencing sharp and throbbing pain in his left foot for 4 months since he stepped off a ladder.  Doc. 12-8 at 66.  Ewing reported pain at an 8 out of 10 that was aggravated by standing, walking, and twisting, but did not report associated weakness.  Doc. 12-8 at 66.  Ewing reported that he had tried treating his foot with rest, 6 weeks in a boot, 24 visits of physical therapy, a brace, orthotics, and medication (including Neurontin), all without improvement.  Doc. 12-8 at 66–67. Ewing stated that he had difficulty walking, wearing a shoe, or even letting a sheet touch his foot at night.  Doc. 12-8 at 67.  Dr. Krauss noted that Ewing walked with "a severely antalgic gait for his left lower extremity" and barely put his foot on the ground.  Doc. 12-8 at 67.  X-ray and MRI from the previous December were essentially negative for acute issues.  Doc. 12-8 at 67.  Dr. Krauss limited Ewing to sedentary work, prescribed Lyrica and nerve blocks, and assessed Ewing with reflex sympathetic dystrophy.  Doc. 12-8 at 67.

On May 29, 2018, Ewing returned to see Dr. Krauss for a follow-up for his foot pain.  Doc. 12-8 at 42.  Ewing reported pain at a 7 out of 10 and said his symptoms had not improved since his last visit.  Doc. 12-8 at 42.  Dr. Krauss recommended an EMG nerve conduction test and continuing nerve blocks, though Ewing already had one block without any significant improvement.  Doc. 12-8 at 43.

On June 20, 2018, Ewing saw Dr. Michael Ellerbusch at Southlake Orthopaedics Sports Medicine and Spine Center for an EMG nerve conduction test on his left lower extremity based on a referral from Dr. Krauss.  Doc. 12-8 at 44–45.  Ewing's results were normal.  Doc. 12-8 at 45–46.  Ewing reported "extreme pain and swelling and numbness and tingling" that was worse in the midfoot and heel and that caused difficulty weight-bearing.  Doc. 12-8 at 50.  Ewing had mild swelling, tenderness, difficulty weight-bearing, and some weakness.  Doc. 12-8 at 50–52.

On June 21, 2018, Ewing returned to see Dr. Krauss.  Doc. 12-8 at 48.  Ewing was still suffering pain in his left foot at an 8 out of 10.  Doc. 12-8 at 48.  Dr. Krauss noted that Ewing's EMG test was normal and that Ewing had 4 to 5 hours of relief from a nerve block, which was a positive response.  Doc. 12-8 at 49.  Dr. Krauss recommended continuing nerve blocks, starting Ewing on Cymbalta, and continuing with his work restrictions.  Doc. 12-8 at 49.

On July 17, 2018, Ewing returned to Dr. Krauss for pain in his left foot.  Doc. 12-8 at 54.  Ewing reported pain at an 8 out of 10 and said that his pain had not improved since his last visit and that a nerve block only helped for 4 to 5 hours.  Doc. 12-8 at 54.  Dr. Krauss noted that Ewing's pain was essentially unchanged after 3 nerve blocks and that taking Cymbalta had not helped.  Doc. 12-8 at 55.  Dr. Krauss stated that he wanted to evaluate and treat Ewing for a diagnosis of RSD (reflex sympathetic dystrophy).  Doc. 12-8 at 55.

On August 13, 2018, Ewing returned to Dr. Krauss, stating that his pain had worsened.  Doc. 12-8 at 56.  Dr. Krauss recommended another MRI.  Doc. 12-8 at 57.

On August 23, 2018, Ewing saw Dr. Krauss after receiving an MRI.  Doc. 12-8 at 58, 61.  Ewing reported that he was still having pain at an 8 out of 10.  Doc. 12-8 at 58.  Dr. Krauss diagnosed Ewing with tarsal tunnel syndrome secondary to a previous post plantar fascia rupture and a metatarsal stress fracture caused by his antalgic gait.  Doc. 12-8 at 60.  Because conservative therapy had failed, Dr. Krauss recommended surgery for left open plantar fascia and tarsal tunnel release.  Doc. 12-8 at 60.

On August 13, 2018, Dr. Krauss performed left plantar fascia release and left tarsal tunnel release surgery on Ewing.  Doc. 12-8 at 62.  Ewing was placed in a short cast and his prognosis was "guarded."  Doc. 12-8 at 63.  On September 10, 2018, Ewing saw a physician's assistant for follow-up after surgery and reported pain at a 6 out of 10.  Doc. 12-8 at 64.  Ewing was told not to work until after his next follow-up appointment.  Doc. 12-8 at 65.  At a second follow-up on September 24, 2018, Ewing still reported pain at a 6 out of 10 and reported swelling in his cast, so he was put in a walking boot.  Doc. 12-8 at 69.

On October 16, 2018, Ewing saw Dr. Krauss for a follow-up after his surgery.  Doc. 12-8 at 71.  Ewing reported that his pain was at a 3 out of 10 and that he was

"doing well." Doc. 12-8 at 71.  Ewing had some tingling, but his pain had improved and he was allowed to weight-bear as tolerated and was directed to begin physical therapy with the expectation of moving from a walking boot to a shoe with a custom orthotic.  Doc. 12-8 at 72.

On October 30, 2018, Ewing returned to Dr. Krauss and reported pain at a 7 out of 10; he was directed to weight-bear as tolerated in a shoe with a custom orthotic and to continue physical therapy.  Doc. 12-8 at 73–74.

On November 1, 2018, Ewing saw Dr. Nileshkumar Chaudhari at the Kirklin Clinic in Birmingham, Alabama, for pain in his left hand and wrist.  Doc. 12-8 at 35. Ewing had injured his hand at the same time he injured his foot in 2017, which caused ulnar-sided wrist pain in his left hand that was worse when he used crutches, but his wrist pain had not really been addressed or treated.  Doc. 12-8 at 35.  Ewing reported pain in his wrist "all the time."  Doc. 12-8 at 35.  Ewing had no swelling and full range of motion.  Doc. 12-8 at 35.  He had no acute fractures but a possible healed fracture.  Doc. 12-8 at 36.  The exam was "not conclusive for specific injury." Doc. 12-8 at 36.  An MRI and a splint were recommended.  Doc. 12-8 at 36.  Ewing was put on "light duty with no lifting [greater than] 10 pounds with left hand," though the records noted that his work status could also be affected by the status of his foot injury.  Doc. 12-8 at 36.  Imaging of Ewing's wrist showed no acute fracture, normal mineralization and alignment, and well preserved joint spaces.  Doc. 12-8 at

37.

On November 27, 2018, Ewing returned to Dr. Krauss for a follow-up after his foot surgery. Doc. 12-8 at 75. He reported pain at an 8 out of 10. Doc. 12-8 at 75. Dr. Krauss adjusted his orthotic. Doc. 12-8 at 76.

On December 5, 2018, Ewing again saw Dr. Chaudhari at the Kirklin Clinic for pain in his left hand and wrist. Doc. 12-8 at 31. Ewing had no swelling but mild pain in his hand and wrist and had full range of motion. Doc. 12-8 at 31. His exam was "not conclusive for specific injury" but he had "a lot of ulnar sided wrist pain which could be several pathologies" and appeared to have a "small" triangular fibrocartilage complex (TFCC) injury. Doc. 12-8 at 32. He was given a corticosteroid injection. Doc. 12-8 at 32.

On December 20, 2018, Ewing returned to Dr. Krauss regarding his foot, reporting pain at an 8 out of 10. Doc. 12-8 at 77. Ewing had significant pain in his metatarsals with swelling, and Dr. Krauss assessed metatarsal stress fractures. Doc. 12-8 at 78. Dr. Krauss ordered a bone scan, directed Ewing to stop physical therapy, and put him back in a walking boot. Doc. 12-8 at 78. The bone scan showed increased activity throughout Ewing's foot[2] consistent with stress fracture or infection. Doc. 12-8 at 79.

---

[2] Again, the record refers to Ewing's right foot, but clearly describes the left. Doc. 12-8 at 79.

On January 8, 2019, Ewing returned to Dr. Krauss for foot pain at an 8 out of 10, but Ewing said that his pain had slightly improved since he went back to using a walking boot.  Doc. 12-8 at 80.  Based on the bone scan data, Dr. Krauss diagnosed a metatarsal stress fracture, put Ewing in a short cast, and directed him to remain non-weight-bearing.  Doc. 12-8 at 81.  At a follow-up on January 15, 2019, Ewing reported that he had cut off his cast after sweating through it.  Doc. 12-8 at 82.  He was directed to go back to the walking boot and use a rolling knee walker.  Doc. 12-8 at 83.  At a January 31, 2019 follow-up, Ewing's pain had improved to a 4 out of 10 because of the knee walker and a bone stimulator.  Doc. 12-8 at 84.

On January 16, 2019, Ewing saw Dr. Chaudhari for ulnar-sided left wrist pain and mild TFCC injury.  Doc. 12-8 at 29.  The records noted that a previous corticosteroid injection had "helped significantly for about 3.5 weeks," but the wrist pain recurred, was worse with lifting, and was better with rest.  Doc. 12-8 at 29.  Ewing had no fractures.  Doc. 12-8 at 30.  His exam was "not conclusive for specific injury."  Doc. 12-8 at 30.  Imaging showed a "small TFCC" injury.  Doc. 12-8 at 30.  A splint was not helping, so surgical intervention including diagnostic wrist arthroscopy and debridement was recommended.  Doc. 12-8 at 30.

On February 21, 2019, Ewing returned to see Dr. Krauss for his foot pain and reported pain at a 5 out of 10 with slight improvement.  Doc. 12-8 at 86.  He was directed to continue wearing a boot and to remain non-weight-bearing.  Doc. 12-8 at

13

87.

On March 21, 2019, Ewing returned to Dr. Krauss for his foot pain.  Doc. 12-8 at 88.  His pain was at a 3 out of 10 and he reported that he was "doing well."  Doc. 12-8 at 88.  His forefoot pain had resolved and he was allowed to weight-bear as tolerated and was directed to start physical therapy; he was allowed to return to work on sedentary duty.  Doc. 12-8 at 89.

On April 4, 2019, Ewing went to ACT Physical Therapy, where he continued to have severe pain that was worse with movement.  Doc. 12-8 at 90.

On April 8, 2019, Ewing returned to Dr. Krauss for his foot pain, reporting pain at an 8 out of 10 and that his symptoms had worsened since his last visit.  Doc. 12-8 at 91.  Ewing reported that the pain was waking him up at night and that he had returned to using crutches; he also had moderate swelling.  Doc. 12-8 at 92.  Dr. Krauss stated that it could be a "flare of [Ewing's] RSD" and that Dr. Krauss "would like to refer him for a sympathetic [nerve] block.  I'm not sure what else I have to offer him." Doc. 12-8 at 92.  Ewing was directed to stop physical therapy.  Doc. 12-8 at 92.

On June 11, 2019, Ewing had another MRI of his left foot that showed "mild periarticular bone marrow edema" and mild degenerative arthrosis, but no other significant abnormalities.  Doc. 12-8 at 93.

On June 20, 2019, Ewing saw Dr. Krauss reporting pain in his foot at an 8 out

14

of 10.  Doc. 12-8 at 94.  Ewing had not received a nerve block because the physician did not think Ewing's pain was due to RSD and did not think a block would help. Doc. 12-8 at 95.  Dr. Krauss told Ewing he had nothing else to offer, and Ewing requested amputation of his foot.  Doc. 12-8 at 95.  Dr. Krauss declined to amputate because he did not think it would decrease Ewing's pain; Dr. Krauss recommended getting a second opinion.  Doc. 12-8 at 95.  Dr. Krauss told Ewing that a psychiatric evaluation would be required before amputation.  Doc. 12-8 at 95.

On October 14, 2019, Ewing saw Dr. Grady Maddox at OrthoSports Associates[3] for his pain in his left wrist and hand.  Doc. 12-8 at 156.  Ewing's pain was "moderate with a rating of 8/10" and was constant, "sharp, stabbing, throbbing, aching, and shooting."  Doc. 12-8 at 156.  His pain was made worse with "twisting, moving, gripping, and lifting" and he experienced clicking, stiffness, and weakness. Doc. 12-8 at 156.  His symptoms were made worse by physical therapy.  Doc. 12-8 at 156.  Ewing was diagnosed with a TFCC tear.  Doc. 12-8 at 158.  After discussion with Dr. Maddox, Ewing elected to proceed with surgical intervention.  Doc. 12-8 at 158.  Ewing was directed not to lift more than 10 pounds and was informed that he could return to work at light duty with a 2-pound lifting restriction 72 hours after surgery.  Doc. 12-8 at 158.

On November 12, 2019, Dr. Maddox performed an arthroscopic TFCC

---

[3] Dr. Chaudhari had moved out of the area.  Doc. 12-8 at 156.

debridement surgery on Ewing's left wrist.  Doc. 12-8 at 160, 189.

On November 21, 2019, Ewing returned to Dr. Maddox for a follow-up after surgery on his wrist; he was doing very well and was directed to continue with physical therapy.  Doc. 12-8 at 159.  Ewing then began occupational therapy and was noted to have excellent "rehab potential."  Doc. 12-8 at 163.

On December 19, 2019, Ewing returned to Dr. Maddox regarding his wrist and reported "soreness and swelling" but said that he was "overall improving."  Doc. 12-8 at 168.  Ewing was directed not to lift more than 10 pounds and to continue therapy; he was fitted with a splint.  Doc. 12-8 at 168.

On January 16, 2020, Ewing again saw Dr. Maddox for a follow-up after his wrist surgery.  Doc. 12-8 at 169.  Ewing reported that his pain had slightly improved and his range of motion had "only mildly improved"; Dr. Maddox noted that Ewing's therapist stated that Ewing was "advancing somewhat slowly."  Doc. 12-8 at 169.  Ewing also complained of pain in his feet, noting that his right foot had begun to "give him problems."  Doc. 12-8 at 169.  Dr. Maddox gave Ewing a corticosteroid injection for pain in his wrist and "had a long discussion with [Ewing] regarding the absolute need for really working diligently and persistently at strengthening and [range of motion]" in therapy.  Doc. 12-8 at 169.  Dr. Maddox noted that Ewing had been "somewhat apprehensive" in his recovery, which had been "confirmed by therapy."  Doc. 12-8 at 169.  Occupational therapy records from

February 2020 with a therapist, Retta Johnson, showed continued failure to improve. Doc. 12-8 at 171–80.  Ewing's therapy goals included holding a water bottle in his left hand, and he had not met that goal by February 20, 2020.  Doc. 12-8 at 171–80.

On February 13, 2020, Ewing filled out a disability report, stating that the following conditions limited his ability to work:  "degenerative arthritis & RSD/CRPS fractures in left foot," "ruptured plantar fascia collapsed tarsal tunnel," "torn TFCC and arthritis in left hand from injury at work," "lower back," "both hips," and "right foot."  Doc. 12-7 at 6.  He stated that he stopped working on December 1, 2017, because of his conditions.  Doc. 12-7 at 6.  Ewing stated that he worked as a carpenter from 2002 until he became disabled.  Doc. 12-7 at 7.  Ewing stated that he was taking Lyrica.  Doc. 12-7 at 8.

On February 20, 2020, Ewing saw Dr. Maddox for a follow-up.  Doc. 12-8 at 180.  Dr. Maddox noted that Ewing was doing "only mildly better" and that his "major complaint is his feet."  Doc. 12-8 at 180.  Dr. Maddox noted that Ewing's pain had spread from his left foot to his right foot and leg and that he moved very slowly.  Doc. 12-8 at 180.  Dr. Maddox stated that Ewing's therapist reported that progression with Ewing's wrist had been "very slow" and that Ewing had "not been terribly aggressive with his therapy."  Doc. 12-8 at 180.  The therapist felt that Ewing had "significantly plateaued with therapy" and was not making significant improvement, so therapy was discontinued and Dr. Maddox stated that Ewing was

at "maximal medical improvement" regarding his left arm.  Doc. 12-8 at 181.  Dr. Maddox noted that it was hard to assess wrist limitations and restrictions because of Ewing's lower extremity issues.  Doc. 12-8 at 181.

On March 3, 2020, Ewing filled out a hand questionnaire, in which he stated that he had problems using his hand(s) to get dressed because he had severe trouble pulling up pants and putting on socks and shoes, such that his wife had to assist him. Doc. 12-7 at 15.  Ewing stated that he did not shave often, but when he did he had to use his right hand, and his wife bathed him and washed his hair.  Doc. 12-7 at 15. He stated that he used his right hand to groom his hair or usually just put on a hat, used his right hand to eat, and had his wife cut his food.  Doc. 12-7 at 15.  He stated that he used his right hand whenever possible and his wife helped him, and that because he also had foot issues "the bed is used as a dressin[g] table."  Doc. 12-7 at 15.  He stated that he does not cook or do chores, and can only drive with his right hand in an automatic vehicle.  Doc. 12-7 at 16.  Ewing stated that he basically just watched television, and that he uses his left hand "very little as gripping twisting turning pushing pulling or putting any kind of torque is extremely painful."  Doc. 12-7 at 17.

On June 30, 2020, Ewing filled out an adult function report.  Doc. 12-7 at 19. Ewing stated that he lives in a house with his wife and children.  Doc. 12-7 at 19. He stated that his daily activities consist of watching television, sitting on the porch,

and lying on the couch, and that he has to "cycle between sitting and lying due to pain in feet hips and back." Doc. 12-7 at 19. He stated that he does not take care of any people or animals, and that he has trouble sleeping due to "extreme pain" in his wrist, hand, feet, hips, and back. Doc. 12-7 at 20.

Consistent with his hand questionnaire, Ewing stated that he could only perform personal grooming with his right hand or with his wife's help. Doc. 12-7 at 20. He stated that either his wife prepared meals or he ate sandwiches or leftovers a couple of times per week, but that he had cooked frequently before his injury. Doc. 12-7 at 21. Ewing stated that he was able to mow the grass on a riding mower about once every 6 weeks. Doc. 12-7 at 21. He stated that he could not do anything that involved walking, bending, kneeling, or standing because it made his pain worse, and that sometimes he sat outside on the porch so he did not feel "so confined." Doc. 12-7 at 22. Ewing stated that he was able to drive and ride in a car, but only for about 30 to 40 miles at a time. Doc. 12-7 at 22. He stated that he did not shop but was able to handle money and finances, though physically handling money with his left hand was difficult due to pain. Doc. 12-7 at 22–23. Ewing stated that he spoke to friends on the phone but seldom went anywhere. Doc. 12-7 at 23. He stated that he has problems getting along with people because his pain and lack of sleep cause irritability. Doc. 12-7 at 24. He stated that "everything" had been greatly affected by his "extreme pain and lack of sleep," and that he could not walk more than maybe

100 to 150 feet without his pain and swelling getting worse, and his pain also impacted his ability to pay attention and to finish things he started.  Doc. 12-7 at 24. He stated that he had always gotten along "great" with authority figures previously but no longer interacted with them, no longer handled stress well, and no longer had any changes in routine.  Doc. 12-7 at 25.  He stated that he used crutches and splints. Doc. 12-7 at 25.

On August 5, 2020, Ewing underwent a consultative evaluation with Dr. Dallas Russell.  Doc. 12-10 at 17–20.  Dr. Russell found on examination that Ewing had "severe restrictions" and "severe weakness" in his left hand.  Doc. 12-10 at 19. Dr. Russell stated that Ewing had "developed a chronic pain syndrome" that began when he stepped off a ladder and landed awkwardly in December 2017.  Doc. 12-10 at 20.  Russell noted that some doctors diagnosed Ewing with RSD, but others did not, that Ewing had developed pain in his right foot in addition to his left foot, and that the pain was getting worse.  Doc. 12-10 at 20.  Dr. Russell noted that Ewing had gait disturbance because of his foot pain.  Doc. 12-10 at 20.  Dr. Russell stated that Ewing also had left wrist pain resulting from the same incident that caused his foot injury and had neck pain in his cervical vertebrae.  Doc. 12-10 at 20.  Dr. Russell noted that Ewing also reported pain in his back, hip, and knees, and had "probable hypertension."  Doc. 12-10 at 20.  Dr. Russell stated that Ewing had tried Cymbalta, Lyrica, nerve blocks, Neurontin, and narcotic pain medicines without benefit, but

had not been to a pain clinic or a neurologist.  Doc. 12-10 at 20–21.  Dr. Russell stated that Ewing's pain was worse at night and prevented him from sleeping.  Doc. 12-10 at 21.

Dr. Russell's examination of Ewing was largely normal, though his blood pressure was 171/125, he had abnormal range of motion in his neck, his left wrist, and his back, and he reported pain in his back, left wrist, and both feet.  Doc. 12-10 at 21–22.  Dr. Russell noted that Ewing had a "slow and antalgic" gait, could not squat, could not heel/toe walk, and could not tandem walk.  Doc. 12-10 at 22.  Dr. Russell noted that Ewing had abnormal grip strength of 3/5 and abnormal fine and gross manipulation in his left hand, and had trouble tying, buttoning, and putting on his shoes.  Doc. 12-10 at 22.

In his medical source statement, Dr. Russell opined:  "Fine motor skills are abnormal.  Handling is abnormal.  Fingering is abnormal.  Gripping is abnormal.  Feeling is normal.  Overhead and forward reaching are normal."  Dr. Russell opined that Ewing had normal vision, hearing, and speech, would be sensitive to extreme environments, and would have difficulty carrying, lifting, pushing, and pulling.  Doc. 12-10 at 23.  Dr. Russell opined that there was no difficulty with sitting, but there was difficulty with standing, walking, climbing, stooping, bending, crawling, kneeling, and crouching.  Doc. 12-10 at 23.  Dr. Russell noted that "pain is subjective and it is difficult to explain the amount of pain that Mr. Ewing says he is in and his

lack of response to any therapy."  Doc. 12-10 at 23.

On March 1, 2021, x-rays of Ewing's left knee, foot, and ankle showed no acute osseous abnormality.  Doc. 12-10 at 26.  The same day, Ewing saw a .primary care physician, Dr. Winter Williams, at the Kirklin Clinic.  Doc. 12-10 at 30–31.  His blood pressure was normal and he had been diagnosed with steatosis of the liver.  Doc. 12-10 at 31.  Ewing stated that he was not interested in psychotherapy or further physical therapy.  Doc. 12-10 at 31.  Ewing reported that marijuana was the only thing that helped his chronic pain.  Doc. 12-10 at 32.  Dr. Williams noted that Ewing denied depression or anxiety, but "some clinical history suggests underlying mood disorder" could be causing his pain; Ewing declined therapy but agreed to a prescription of Effexor (an antidepressant).  Doc. 12-10 at 33.

## B.    Social Security proceedings

### 1.    Initial application and denial of benefits

On February 11, 2020, Ewing filed for disability insurance benefits under Title II of the Social Security Act, alleging an onset date of December 1, 2017.  Doc. 12-6 at 2, 5; Doc. 12-4 at 2.

On August 20, 2020, Ewing's application for disability benefits was denied at the initial level based on a finding that he had dysfunction of major joints but could perform medium work and was not disabled.  Doc. 12-4 at 2–15; Doc. 12-5 at 2.

On September 14, 2020, Ewing requested reconsideration of the initial denial

of his application for benefits.  Doc. 12-5 at 9.  On December 18, 2020, Ewing's application was denied on reconsideration.  Doc. 12-4 at 16–34.

On January 26, 2021, Ewing requested a hearing before an ALJ (Doc. 12-5 at 14), and on September 16, 2021, a telephonic hearing was held (Doc. 12-3 at 41–43).

On October 4, 2021, the ALJ issued an unfavorable decision, finding that Ewing was not disabled under the Social Security Act.  Doc. 12-3 at 15–30.

### 2.    ALJ hearing

On September 16, 2021, the ALJ held a telephonic hearing on Ewing's application for disability benefits.  Doc. 12-3 at 41–43.  The ALJ noted that Ewing's alleged onset date was December 1, 2017.  Doc. 12-3 at 44.

The ALJ asked Ewing if a physician had placed any medical restriction on his functioning since December 1, 2017, and Ewing said that in summer or early fall 2019 he was restricted to sedentary work.  Doc. 12-3 at 46.  Ewing testified that he was not currently receiving any treatment other than medication, and that he was taking his medication as prescribed.  Doc. 12-3 at 46–47.  Ewing testified that he thought he had been recommended pain management medication, but he declined because it might cause liver damage.  Doc. 12-3 at 47.  The ALJ asked if any doctor had ever recommended amputation, and Ewing said no.  Doc. 12-3 at 48.

Ewing testified that, on a typical day, he "pretty much just [has] to sit around"

23

and does not stand or walk more than 5 minutes at a time because his foot will swell and his pain will increase, so he has to sit down and elevate his foot and ice it throughout the day.  Doc. 12-3 at 49.  The ALJ asked why Ewing could not do a job where he could sit with his foot elevated, and Ewing testified that he often transitions to a "laid back position" because he also has "issues" in his neck, and the pain gets very bad so he needs to lie back to relieve it.  Doc. 12-3 at 49.  He testified that he also has to "swap sides" because he has issues in his lower back and hips, and has to "transition from lying to sitting."  Doc. 12-3 at 49.  Ewing testified that he used a knee walker.  Doc. 12-3 at 50.

Upon questioning from his counsel, Ewing testified that he could not stand up for more than 10 minutes at a time and could not stand for more than 30 minutes to an hour over the course of an 8-hour workday.  Doc. 12-3 at 51.  He testified that he could only walk for a couple of minutes at a time and only for about 30 to 45 minutes per day.  Doc. 12-3 at 51.  Ewing testified that he could only sit in a chair for about 10 minutes before needing to stand up or lie down.  Doc. 12-3 at 52.  He testified that he must lie down for several hours per day, though the time varies from day to day.  Doc. 12-3 at 53.  Ewing testified that he has "tremendous" problems with fine motor skills including handling, fingering, and gripping, so he has trouble eating, getting dressed, and with everyday life in general.  Doc. 12-3 at 53–54.  Ewing said that the heaviest thing he could carry more than 10 feet in the past year was a gallon

of milk from the refrigerator, and only with his right hand, not his left.  Doc. 12-3 at 54–55.  Ewing testified that his pain at the time of the hearing was about an 8 or 9 out of 10, and on an average day was a constant 6 or 7 out of 10.  Doc. 12-3 at 55–56.  Ewing testified that his pain makes him depressed.  Doc.12-3 at 56–57.  Ewing testified that he had lost his home.  Doc. 12-3 at 57.  He testified that he had not had counseling and was not aware of it being recommended.  Doc. 12-3 at 57.  Ewing testified that his "life's been hell for the last four years.  Simple as that."  Doc. 12-3 at 57.

Ewing testified that his injury arose from a work injury, and that he had received a worker's compensation settlement and his worker's compensation case was closed.  Doc. 12-3 at 57–59.  Ewing testified that, when he told doctors about his pain, they just x-rayed his foot, and one doctor prescribed him Effexor to try to help his nerve pain.  Doc. 12-3 at 59–60.  Ewing testified that he had diabetes and had lost 50 pounds since he last went to the doctor after he cut out sugar.  Doc. 12-3 at 61.

Vocational Expert (VE) Pedro Roman testified that Ewing's past work as a carpenter qualified as work at a medium level, and that those skills did not transfer to perform any skills at the sedentary level.  Doc. 12-3 at 62–63.  The VE testified that a hypothetical individual of Ewing's age, education, work experience, and RFC could not perform Ewing's past work as a carpenter, but could perform the job of

"call out operator."  Doc. 12-3 at 66.  However, upon questioning from counsel, the VE testified that such a hypothetical individual would not be able to perform the job of call out operator if he needed to recline and elevate his lower extremity for extended periods throughout the day.  Doc. 12-3 at 68.

### 3.    ALJ decision

On October 4, 2021, the ALJ entered an unfavorable decision.  Doc. 12-3 at 15.

In the decision, the ALJ found that Ewing met the requirements for insured status through September 30, 2023.  Doc. 12-3 at 18.  "After careful consideration of all the evidence," the ALJ concluded that Ewing "was not under a disability within the meaning of the Social Security Act from December 1, 2017, through the date of this decision."  Doc. 12-3 at 19.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a); *Winschel*, 631 F.3d at 1178).  Doc. 12-3 at 19–20.  The ALJ found that Ewing was insured through September 30, 2023, that he had not engaged in substantial gainful activity since his alleged onset date of December 1, 2017, and that Ewing had severe impairments of "left lower extremity injury, left wrist/hand injury, diabetes mellitus, and obesity."  Doc. 12-3 at 21–22.  In considering Ewing's severe impairments, the ALJ found that Ewing qualified as mildly or moderately obese and that obesity could exacerbate the symptoms of his other medical

conditions, so his obesity constituted "a severe impairment in combination with his other impairments in this case."  Doc. 12-3 at 21.

The ALJ found that Ewing had non-severe impairments of "hyperlipidemia, hepatomegaly with steatosis, tobacco use, and mood disorder."  Doc. 12-3 at 21.  The ALJ found that none of those conditions caused Ewing to suffer more than minimal work-related limitations for 12 or more continuous months, so they qualified as non-severe.  Doc. 12-3 at 21.  Nevertheless, the ALJ stated that the ALJ "considered all the claimant's medically determinable impairments, including those that are not severe, when assessing [Ewing's] residual functional capacity."  Doc. 12-3 at 21.  The ALJ found that Ewing's mood disorder did not cause more than a mild limitation in any functional areas.  Doc. 12-3 at 22.  The ALJ found that Ewing did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 12-3 at 22–23.

The ALJ determined Ewing's RFC (or residual functional capacity), finding that Ewing could "perform sedentary work," except that he was unable to climb ladders, ropes, scaffolds, or stairs, or to perform around hazards, or in concentrated exposure to extreme hot or cold temperatures, wetness, or vibration, could use a rolling knee walker but it was not required, could rarely (no more than 10% of the workday) climb ramps, could occasionally use the left (non-dominant) upper

extremity for fingering and handling, could frequently stoop and rarely kneel (excluding the use of the rolling knee walker), crouch, or crawl.  Doc. 12-3 at 23.

The ALJ stated that the ALJ had considered all of Ewing's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence. Doc. 12-3 at 23.  The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings.  Doc. 12-3 at 23.

In assessing Ewing's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 12-3 at 23.

The ALJ then provided a summary of Ewing's alleged conditions limiting his ability to work, including a work-related injury to his left lower extremity and left wrist/hand.  Doc. 12-3 at 24.  The ALJ stated that Ewing also alleged that he "cannot work a sedentary job because he transitions from sitting to a laid-back position," and has neck pain that requires him to get "relief by lying back."  Doc. 12-3 at 24.  The ALJ found that Ewing uses a rolling knee walker but no other assistive devices, and alleges that he cannot stand for more than 10 minutes at a time or 30 minutes in 8

hours.  Doc. 12-3 at 24.  The ALJ stated that Ewing alleged that he can only walk "for a couple of minutes at a time" and no more than 30 to 45 minutes over the course of an 8-hour day.  Doc. 12-3 at 24.  The ALJ stated that Ewing alleged that he could not sit in an office chair for more than "a couple of minutes" before needing to change positions, and that he otherwise spent the day lying down, though how much time he spent lying down varied.  Doc. 12-3 at 24.  The ALJ stated that Ewing alleged that he had been spending "several hours" lying down per day because his neck caused headaches and he needed to put his feet up.  Doc. 12-3 at 24.  The ALJ noted that Ewing alleged that he had "problems with everyday life in general," that the most he had carried more than 10 feet in the past year was a gallon of milk in his right hand, and that his average pain was "moderate" but could "become severe with more activity."  Doc. 12-3 at 24.  The ALJ stated that Ewing alleged that he had trouble concentrating due to pain.  Doc. 12-3 at 24.

The ALJ summarized Ewing's June 30, 2020 function report, noting that Ewing alleged overall difficulty with "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, understanding, and using hands," alleging that "everything was affected by extreme pain and lack of sleep."  Doc. 12-3 at 24.  The ALJ stated that Ewing alleged in his function report that he could not walk very far and could only walk about 100 feet before needing to sit down, and alleged that his injury caused swelling so he had to

"elevate and ice it."  Doc. 12-3 at 24.

The ALJ also summarized Ewing's hand questionnaire from March 2020, noting that Ewing stated that he does most things with his right hand, that his wife helps with bathing and grooming, that he "cannot otherwise use his left hand," that he does not cook or do chores, that he drives using his right hand only, and that using his left hand for "gripping, twisting, turning, pushing, pulling, or putting any kind of torque is extremely painful."  Doc. 12-3 at 24.

Based on "careful consideration of the evidence," the ALJ found that Ewing's "medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations," but that Ewing's "statements concerning the intensity, persistence, and limiting effects" of his symptoms "[we]re inconsistent with the objective medical evidence, treatment regimen and response to treatment, and daily activities."  Doc. 12-3 at 24.

The ALJ found that Ewing's statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the objective evidence, which did not support Ewing's alleged loss of functioning.  Doc. 12-3 at 24.  The ALJ provided a detailed summary of Ewing's medical records, beginning with Ewing's December 1, 2017 emergency room visit after he stepped off a ladder and felt a pop in his left foot/ankle and examination revealed tenderness and swelling but x-ray showed no acute abnormality.  Doc. 12-3 at 25.  The ALJ found that Ewing

was placed in a walking boot and discharged with a diagnosis of plantar fascia syndrome and foot sprain. Doc. 12-3 at 25. The ALJ found that a subsequent MRI showed "severe proximal plantar fasciitis," but no other significant abnormalities. Doc. 12-3 at 25. The ALJ then summarized Ewing's orthopedic treatment records, which showed that 6 weeks in a boot and 24 physical therapy appointments reportedly did not provide relief, nor did orthotics or Neurontin or medication or nerve blocks, and that Ewing had swelling and pain that limited his range of motion in April 2018 but x-ray showed no obvious issues. Doc. 12-3 at 25. The ALJ found that the records showed that Ewing had surgery on his foot in August 2018 and was placed in a short cast and directed not to bear weight on his foot, and that he reported doing well with some tenderness in October 2018 and was sent to physical therapy. Doc. 12-3 at 25. The ALJ found that Ewing was still experiencing pain, so a bone scan was ordered that showed a stress fracture in Ewing's left foot. Doc. 12-3 at 25. The ALJ found that the records showed that Ewing was placed in a cast and directed not to bear weight, but he removed the cast due to sweating and swelling; subsequent examination revealed mild swelling and unchanged pain, so Ewing was given a rolling knee walker and bone stimulator. Doc. 12-3 at 25. The ALJ found that Ewing reported doing well in March 2019 with no pain, but in April 2019 reported pain when walking and had swelling, so he had an MRI that "showed only mild periarticular marrow edema in the midfoot with no fracture or stress reaction" and

31

was advised that there was nothing that the physician could do.  Doc. 12-3 at 25.
The ALJ found that the record showed that Ewing asked for an amputation of his
foot, but the doctor did not think it would decrease Ewing's pain and declined to
amputate.  Doc. 12-3 at 25.

The ALJ also summarized records relating to an injury to Ewing's left hand
and wrist; the ALJ found that x-ray of the injury showed no acute fracture or
dislocation and normal mineralization and alignment with well preserved joint
spaces, but MRI showed mild TFCC injury.  Doc. 12-3 at 25–26.  The ALJ found
that Ewing had pain and had a steroid injection, but had no swelling and full range
of motion at the wrist and fingers; examination was "felt to be inconclusive for
specific injury" and diagnostic arthroscopy and debridement were recommended.
Doc. 12-3 at 26.  The ALJ found that Ewing went to a new surgeon in October 2019
with moderate but worsening pain and surgery again was recommended.  Doc. 12-3
at 26.  The ALJ found that Ewing reported doing well with controlled pain after
surgery and was placed in a splint and advised to only lift 5 pounds; he also began
occupational therapy where he complained of pain and swelling but was improving.
Doc. 12-3 at 26.  The ALJ found that Ewing's therapy progress was slow, which was
"attributed to guarding and [Ewing] not being terribly aggressive with his therapy,"
and that he was advised to work diligently but stopped making progress in February
2020, so therapy was stopped and Ewing was "placed at maximal medical

improvement."  Doc. 12-3 at 26.

The ALJ summarized Ewing's consultative physical examination with Dr. Russell from August 2020, where he exhibited reduced range of motion in his neck but was otherwise normal except for some decreased range of motion and decreased grip and pinch strength in his left hand.  Doc. 12-3 at 26.  The ALJ found that Ewing had a negative straight leg raise, normal motor strength, sensation, and reflexes, and no atrophy.  Doc. 12-3 at 26.

The ALJ found that the record showed no further musculoskeletal treatment until March 2021, when Ewing reported pain in his left hip, left knee, left foot, and both hands, and reported that "marijuana was the only thing that helps with his chronic pain."  Doc. 12-3 at 27.  The ALJ found that Ewing's physical examination was normal except for mild tenderness in his left knee and hip and that the physician felt that an underlying mood disorder might be causing Ewing's symptoms and prescribed Effexor, though Ewing denied depression or anxiety.  Doc. 12-3 at 27.  Ewing was also diagnosed with diabetes.  Doc. 12-3 at 26–27.

The ALJ found that the overall record supported a finding that Ewing's upper and lower left extremity impairments, in combination with his obesity, limited him to sedentary work, and that he required further limitations reflected in the RFC in order to avoid exacerbation of his pain.  Doc. 12-3 at 27.

The ALJ stated that the ALJ "fully considered the medical opinions and prior

administrative medical findings" in the record, but could not defer to them or give them controlling weight.  Doc. 12-3 at 27.  The ALJ stated that the ALJ "rarely finds opinions to be simply 'persuasive' or 'not persuasive,' either accepting them word-[for]-word or rejecting them altogether."  Doc. 12-3 at 27.

The ALJ found "not fully persuasive" the state agency opinions, noting that the state agency consultants did not have the benefit of additional medical evidence or testimony.  Doc. 12-3 at 27.  The ALJ found that a limitation to sedentary, rather than medium, work was supported by the record.  Doc. 12-3 at 27.

The ALJ found the opinion of the consultative medical examiner, Dr. Russell, "somewhat persuasive."  Doc. 12-3 at 27.  The ALJ provided a thorough and detailed summary of Dr. Russell's opinion, including the examination and opinion that Ewing had limitations in carrying and lifting, pushing and pulling due to his left wrist, standing, walking, climbing, stooping, bending, crawling, kneeling, and crouching. Doc. 12-3 at 27–28.  The ALJ then found that the limitations were "vague because they are not quantified," but that they were "generally consistent with findings upon examination and the record as a whole," so "the opined limitations were quantified and appropriately accommodated in the claimant's residual functional capacity to the extent reasonably supported by and consistent with the record as a whole."  Doc. 12-3 at 28.

The ALJ found orthopedic opinions regarding limitations to sedentary work

and to lifting 10 pounds with the left arm to be somewhat persuasive, in that Ewing required further limitations as noted by the consultative examiner.  Doc. 12-3 at 28.

The ALJ stated that the record might contain other information for which the ALJ was not required to articulate a finding, but the ALJ "did, however, review and consider this evidence, along with all other evidence in the claim."  Doc. 12-3 at 28.

The ALJ found that Ewing was unable to perform his past relevant work as a carpenter.  Doc. 12-3 at 28.

At step five, after considering Ewing's age, education, work experience, RFC, and the testimony of the VE, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Ewing] can perform."  Doc. 12-3 at 29.

Consequently, the ALJ determined that Ewing was not disabled under the Social Security Act.  Doc. 12-3 at 30.

### 4.   Appeals Council decision

On April 19, 2022, the Appeals Council denied Ewing's request for review of the ALJ's October 4, 2021 decision, finding no reason to review the ALJ's decision. Doc. 12-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

**DISCUSSION**

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.     The ALJ properly assessed Ewing's subjective testimony regarding his impairments.

The ALJ properly assessed Ewing's subjective testimony regarding his impairments and pain.   The ALJ's decision was based on the multi-part "pain standard," and substantial evidence supported the ALJ's decision not to credit Ewing's subjective testimony regarding his pain.

### A.     The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."   In his brief, Ewing argues that the ALJ did not correctly consider Ewing's pain as documented in the record.   Doc. 16 at 15–16.   But the ALJ's consideration of Ewing's pain properly tracked the applicable regulations and caselaw.

When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.   That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the

alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 404.1529 (standard for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard. In analyzing Ewing's RFC, and the extent to which Ewing's symptoms limited his functioning, the ALJ's stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 12-3 at 23. The ALJ then applied the two-part test and found that Ewing's "medically determinable

impairments could reasonably be expected to cause some symptoms and functional limitations," but that Ewing's "statements concerning the intensity, persistence, and limiting effects" of his symptoms "[we]re inconsistent with the objective medical evidence, treatment regimen and response to treatment, and daily activities." Doc. 12-3 at 24. Thus, the ALJ's decision was based on the proper legal standards.

**B.  Substantial evidence supported the ALJ's decision to discredit Ewing's subjective testimony regarding his pain.**

Furthermore, substantial evidence supported the ALJ's decision not to credit Ewing's subjective testimony regarding his pain.

**1.  The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.   20 C.F.R. § 404.1529.   Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms."  20 C.F.R. § 404.1529(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole."  *Dyer*, 395 F.3d at 1210

(quotation marks and alterations omitted).[4]  "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."  *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

### 2. The ALJ properly explained the decision not to credit Ewing's subjective testimony regarding his pain, and substantial evidence supported that decision.

The ALJ properly explained the decision to discredit Ewing's subjective testimony regarding his pain, and substantial evidence supported the ALJ's decision.

The ALJ made a clear and explicit finding that the ALJ did not credit Ewing's testimony about the intensity, persistence, and limiting effects of his symptoms because his testimony was "inconsistent with the objective medical evidence, treatment regimen and response to treatment, and daily activities."  Doc. 12-3 at 24. The ALJ then found that Ewing's testimony was inconsistent with the record evidence, finding that "the objective evidence of record generally does not support

---

[4] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities."  *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record.  *Id.* at 1308 n.3.

the alleged loss of functioning." Doc. 12-3 at 24–25.  Accordingly, the ALJ provided

an explicit articulation for discrediting Ewing's subjective testimony.  *Wilson*, 284

F.3d at 1225.

        In arriving at that articulation, the ALJ fully considered all of the record

evidence, including, but not limited to, the objective evidence.  In his brief, Ewing

argues that the ALJ cherry-picked from the record without adequately reviewing the

entire record and did not show "proper recognition of the opinions and conclusions

of Mr. Ewing's treating physicians, in addition to proper consideration of the

objective tests in this case."  Doc. 16 at 13–15.  However, in determining Ewing's

RFC (and citing 20 C.F.R. § 404.1529 and SSR 16-3p), the ALJ stated that the ALJ

considered "all symptoms and the extent to which these symptoms can reasonably

be accepted as consistent with the objective medical evidence and other evidence"

and considered any medical opinions and prior administrative medical findings.

Doc. 12-3 at 23.  The ALJ's decision demonstrates that the ALJ considered

information based on both objective and subjective evidence in the record that called

into doubt Ewing's subjective testimony about the severity of his pain and its effects

on his ability to work.  *See* 20 C.F.R. § 404.1529.

        The ALJ considered Ewing's hearing testimony, function report, and hand

questionnaire, and then went on to support the finding regarding Ewing's credibility

with a detailed and thorough recounting of Ewing's medical records.  Doc. 12-3 at

24–27.  In that recounting of Ewing's medical records, the ALJ took into account and provided lengthy summaries of Ewing's treatment notes from Dr. Hurowitz, Dr. Krauss, Dr. Chaudhari, Dr. Maddox, and Dr. Williams.  Doc. 12-3 at 24–27.  In addressing Ewing's foot pain, the ALJ's summary included the facts that Ewing's objective imaging and tests generally did not show significant abnormalities, that various treatments did not seem to alleviate his issues, that Ewing sometimes stated he was doing well but then claimed a return of severe pain, that physicians advised that there was "nothing further they could do for [Ewing]," and that a physician refused to perform an amputation because he did not think it would help Ewing's situation.  Doc. 12-3 at 25.  In addressing Ewing's wrist pain, the ALJ found that imaging was normal except for a mild TFCC injury, that Ewing had full range of motion, that multiple examinations were inconclusive for specific injury, and that Ewing was doing well after surgery but then had slow progress and was not aggressive with therapy and reached maximal medical improvement.  Doc. 12-3 at 15–26.

The ALJ also considered the consultative examination of Dr. Russell, noting the limitations as to which Dr. Russell opined—including reduced range of motion in Ewing's neck and decreased motion, grip, and pinch strength in his left hand— but also noting that Ewing had normal strength, sensation, and reflexes, and no atrophy.  Doc. 12-3 at 26.  Ultimately, the ALJ found Dr. Russell's opinion only

somewhat persuasive—primarily due to the vagueness of limitations—but quantified and accommodated in the RFC finding those limitations that were supported by Dr. Russell's examination and consistent with the record.  Doc. 12-3 at 27.

The ALJ also considered the evidence that Ewing apparently did not undergo any treatment for his musculoskeletal impairments from early 2020 until March 2021, when he said that only marijuana helped his pain, that he had inconclusive x-rays, and that his physician thought that his pain might be attributable to a mood disorder.  Doc. 12-3 at 26.

The ALJ then took into account all of that information and found that the record supported not only a limitation to sedentary exertion, but also further limitations "to avoid exacerbation of [Ewing's] pain."  Doc. 12-3 at 27.  Thus, the ALJ's RFC determination accounted for the credible portions of Ewing's testimony regarding his impairments and pain.

As such, the ALJ's decision contains "explicit and adequate reasons for discrediting" Ewing's subjective testimony.  *Wilson*, 284 F.3d at 1225.  The ALJ's detailed summary of the record shows that the ALJ did not reject Ewing's testimony only because it was not substantiated by the available medical evidence (*see* 20 C.F.R § 404.1529(c)(2)), and instead considered all of the evidence, objective and subjective (*see* 20 C.F.R. § 404.1529).  The ALJ's detailed recitation of the record

43

shows that the decision to discredit Ewing's subjective testimony about his pain was based on Ewing's medical condition as a whole and was not "merely" a "broad rejection." *Dyer*, 395 F.3d at 1210.

Further, substantial evidence supported the ALJ's decision not to credit Ewing's testimony about his pain. Objective imaging and testing of Ewing's foot and wrist consistently showed either mild abnormalities/injuries or no clear abnormalities/injuries (*see* Doc. 12-8 at 10, 15, 36, 45–46, 67, 93; Doc. 12-10 at 26), and his injury to his foot was initially diagnosed as "minimal" or "mild," while his wrist was not initially addressed at all (Doc. 12-8 at 6–9). Several physicians frequently recommended conservative treatment, including injections and braces. Doc. 12-8 at 32, 49, 67, 202. After more intensive surgical treatment, Ewing often reported doing well, but then worsened when he was required to attend physical therapy. Doc. 12-8 at 71–74, 77, 88, 90, 156, 159. The record shows that at one point Ewing cut off his cast because of sweating. Doc. 12-8 at 82. Multiple exams of Ewing's wrist were "not conclusive for specific injury" (Doc. 12-8 at 30, 32, 36), and several physicians opined after treating Ewing that there was nothing they could do to address his complaints. Doc. 12-8 at 92, 95. Ewing was initially assessed as having "excellent rehab potential" at occupational therapy following his hand surgery, but he was apprehensive about therapy and, even after instructions on the importance of working diligently and persistently at strength and range of motion,

he was not aggressive with therapy; his progress slowed and then stopped until he "significantly plateaued" and therapy was discontinued.  Doc. 12-8 at 163, 169–181.

In addition, Ewing apparently did not seek treatment between February 2020 and March 2021.  *See* Doc. 12-7 at 15; Doc. 12-10 at 26.  When Ewing did see a primary care physician in March 2021, Dr. Williams opined that Ewing's pain could be caused by a mood disorder, but Ewing stated that he was not interested in psychotherapy or physical therapy and stated that using marijuana was the only thing that helped his pain.  Doc. 12-10 at 30–32.  Dr. Russell included in his notes from Ewing's consultative examination that "it is difficult to explain the amount of pain that Mr. Ewing says he is in and his lack of response to any therapy."  Doc. 12-10 at 23.

While Ewing testified in his hearing that he could only sit for 10 minutes before he had to stand up or lie down (Doc. 12-3 at 52), he stated in his function report that he spent the day mostly watching television and that he was able to drive or ride in a car for 30 to 40 miles at a time and could use a riding mower to mow the lawn (Doc. 12-7 at 19, 21–22).  He also stated that he was not receiving any treatment other than medication, and that he thought that pain management medication had been recommended, but that he declined based on concerns about liver damage.  Doc. 12-3 at 46–47.

Importantly, while several physicians recommended sedentary work and/or

lifting restrictions (*see* Doc. 12-8 at 36, 67, 88, 158, 203), those restrictions are accommodated in the ALJ's RFC finding (*see* Doc. 12-3 at 23).

Thus, the record includes sufficient facts inconsistent with Ewing's alleged limitations to support the ALJ's RFC finding and ultimate finding that Ewing was not disabled.   As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)).   In other words, "[u]nder a substantial evidence standard of review, [a plaintiff] must do more than point to evidence in the record that supports [his] position; [he] must show the absence of substantial evidence supporting the ALJ's conclusion." *Sims v. Commissioner of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (citing *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).   In this case, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Ewing's testimony regarding his pain and impairments was not consistent with the record.   *See Crawford*, 363 F.3d at 1158. As a result, substantial evidence supported the ALJ's decision.   And, because the ALJ clearly articulated a credibility finding supported by substantial evidence, the court cannot disturb that finding.   *See Foote*, 67 F.3d at 1562.

**II.    The ALJ properly assessed the opinion of Dr. Dallas Russell according to the applicable regulations, and substantial evidence supported the ALJ's decision to find that Dr. Russell's opinion was only somewhat persuasive.**

The ALJ properly assessed the opinion of Dr. Dallas Russell pursuant to the applicable regulations, and substantial evidence supported the ALJ's decision to find Dr. Russell's opinion only somewhat persuasive.  In his briefing, Ewing argues that the ALJ improperly failed to consider Dr. Russell's finding of "probable hypertension" and "mischaracterize[d]" Dr. Russell's examination findings regarding Ewing's restrictions and weakness in his left hand by understating their severity.  Doc. 16 at 16–17.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician.  20 C.F.R. § 404.1520c(a).  The Eleventh Circuit has found that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician.  *See Harner v. Social Sec. Admin., Comm'r*, 38 F.4th 892 (11th Cir. 2022).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship

with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. § 404.1520c(b)(2). "Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. § 404.1520c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. § 404.1520c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant

is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer*, 395 F.3d at 1210. Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must find the claimant's RFC. *See, e.g.*, 20 C.F.R. § 404.1546(c).

In this case, the ALJ applied those new, revised regulations. Dr. Russell opined that Ewing's "[f]ine motor skills are abnormal. Handling is abnormal. Fingering is abnormal. Gripping is abnormal. Feeling is normal. Overhead and forward reaching are normal." Doc. 12-10 at 23. Dr. Russell opined that Ewing had normal vision, hearing, and speech, would be "sensitive" to extreme environments, and would have "difficulty" carrying, lifting, pushing, and pulling. Doc. 12-10 at 23. Dr. Russell opined that there was "no difficulty" with sitting, but there was "difficulty" with standing, walking, climbing, stooping, bending, crawling, kneeling, and crouching. Doc. 12-10 at 23.

The ALJ found that Dr. Russell's opinion was "only somewhat persuasive," finding that the limitations as opined by Dr. Russell were "vague because they are not quantified, however, they are generally consistent with findings upon examination and the record as a whole. Accordingly, the opined limitations were

49

quantified and appropriately accommodated in the claimant's residual functional capacity to the extent reasonably supported by and consistent with the record as a whole."  Doc. 12-3 at 27–28.

The ALJ's decision shows that the ALJ properly considered and explained the supportability and consistency of Dr. Russell's opinion.   In considering the supportability and consistency of Dr. Russell's opinion (*see* 20 C.F.R. § 404.1520c(c)), the ALJ listed Ewing's limitations as set forth by Dr. Russell, including that Ewing had abnormal fine motor skills, handling, fingering, and grip. Doc. 12-3 at 27.  Earlier in the decision, the ALJ also detailed Dr. Russell's findings from his examination of Ewing, including "decreased range of motion and decreased grip and pinch strength" in Ewing's left hand.  Doc. 12-3 at 26.  The ALJ found that the limitations set forth by Dr. Russell were vague, but were "generally consistent with findings upon examination and the record as a whole."  Doc. 12-3 at 28.  Thus, as required by the applicable regulations, the ALJ properly assessed the "supportability" of the limitations set forth in Dr. Russell's opinion by comparing them to Dr. Russell's own examination notes (*see* 20 C.F.R. § 404.1520c(c)(1)), and assessed the "consistency" by comparing the limitations to the rest of the record (*see* 20 C.F.R. § 404.1520c(c)(2)).

While this court cannot "reweigh the evidence" (*Winschel*, 631 F.3d at 1178), substantial evidence supported the ALJ's findings regarding the supportability,

consistency, and partial persuasiveness of Dr. Russell's opinion.  After assessing the

supportability and consistency of Dr. Russell's opinion, the ALJ actually found that

the limitations expressed by Dr. Russell were supportable and consistent; they were

simply limited in their usefulness to the ALJ's RFC finding by their vagueness.  The

record supports that finding of vagueness because the limitations expressed by Dr.

Russell contained only nonspecific characterizations of broad "difficulty" with tasks,

rather than providing quantifiable limitations to Ewing's abilities.  The ALJ then

took into account both Dr. Russell's notes and the record evidence to add more

specificity to the limitations as to which Dr. Russell had opined.  *See* Doc. 12-3 at

28.  The ALJ did not clearly disregard any of the limitations as opined by Dr. Russell,

but instead incorporated them into the ALJ's RFC finding based on Dr. Russell's

examination and the other record evidence.  *See* Doc. 12-3 at 27–28.

While Ewing argues in his briefing that the ALJ erred by failing to mention

Ewing's "probable hypertension," as noted during Dr. Russell's examination (*see*

Doc. 16 at 16–17), substantial evidence supported the ALJ's decision.  First, Dr.

Russell noted only *probable* hypertension based on his examination of Ewing and

did not include any limitations relating to hypertension in his medical source

statement.  Doc. 12-10 at 23.  Further, records from Ewing's primary care physician

in 2021 showed normal blood pressure.  Doc. 12-10 at 31.  Therefore, Ewing cannot

show that the ALJ erred by failing to factor in an impairment that was not

demonstrated by either Dr. Russell's examination or the other record evidence.

Nor did the ALJ err in addressing Dr. Russell's opinion of severe restrictions and weakness in Ewing's left hand. Doc. 16 at 17. Ewing argues that the ALJ erred by characterizing Ewing's left hand as having "decreased" range of motion and grip strength (whereas Dr. Russell found "severe" restrictions and weakness), and by finding in the RFC that Ewing could use his left hand for fingering and handling. Doc. 16 at 17. But, in the RFC, the ALJ found that Ewing could "occasionally use the left (non-dominant) upper extremity for fingering and handling." Doc. 12-3 at 23. Nothing in Dr. Russell's examination and opinion contradicts that finding; like the other findings in Dr. Russell's opinion the word "severe" is vague and does not indicate that Ewing *never* can use his left hand for fingering and handling. Further, other parts of the record also do not exclude the possibility of occasional fingering and handling; for example, Dr. Maddox's various restrictions on Ewing's activities encompassed lifting, but not fingering and handling, and she encouraged him to make greater effort at therapy. *See* Doc. 12-8 at 158, 168–69, 180–81. Accordingly, Ewing cannot show that the ALJ erred in his finding with regard to that RFC limitation.

In sum, a "reasonable person would accept" the evidence that the ALJ reviewed as "adequate to support [the] conclusion" that Dr. Russell's opinion was somewhat persuasive, supported by and consistent with the record, and vague, as

well as the ALJ's incorporation of that opinion into the RFC finding based on Dr. Russell's examination and the other record evidence. *See Crawford*, 363 F.3d at 1158. Consequently, substantial evidence supported the ALJ's findings.

## III. The ALJ properly considered medical records from Ewing's occupational therapist, Retta Johnson.

The ALJ properly considered the medical records from Ewing's occupational therapist, Retta Johnson. In his briefing, Ewing argues that the ALJ erred by failing to recognize Ms. Johnson's note that, at therapy on February 20, 2020, Ewing had not met his therapy goals, including being able to hold a water bottle in his left hand. Doc. 16 at 17. Ewing argues that, in light of that note from Johnson (and the rest of the record), the ALJ's RFC finding was not supported by substantial evidence. Doc. 16 at 17–18.

As a threshold matter (and as discussed above), the SSA has revised its regulations on the consideration of medical opinions and prior administrative medical findings for all claims like this one filed on or after March 27, 2017, and an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)," including the opinion of a treating or examining physician. 20 C.F.R. § 404.1520c(a). Regardless, in this case, the evidence from Ewing's occupational therapist does not constitute medical opinion evidence requiring consideration under the new, controlling regulations anyway. *See* 20 C.F.R. § 404.1520c.

In the revised regulations, the SSA did not include occupational or physical therapists in the list of acceptable medical sources. *See* 20 C.F.R. § 404.1502(a) (listing acceptable medical sources); *see also, e.g.*, *Boone v. Commissioner of Soc. Sec.*, No. 3:21-CV-00279, 2023 WL 4274996, at *7 (S.D. Tex. June 29, 2023), *aff'd sub nom. Boone v. O'Malley*, No. 23-40401, 2023 WL 9018388 (5th Cir. Dec. 29, 2023) ("The Code of Federal Regulations defines "[a]cceptable medical source" by providing eight professions that qualify as acceptable medical sources, none of which include occupational therapists . . . . Accordingly, an occupational therapist is not an acceptable medical source."). And, under those new regulations, the ALJ is "not required to articulate how [the ALJ] considered evidence from nonmedical sources using the requirements" for evaluating medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(d).

In any event, here, the ALJ did consider Ewing's occupational therapy records in finding Ewing's RFC. In recounting Ewing's medical history and making a credibility determination, the ALJ specifically found that Ewing attended occupational therapy beginning in late 2019, that he had slow progress, that his therapist attributed the slow progress to Ewing "not being terribly aggressive with his therapy," and that therapy was stopped due to lack of progress. Doc. 12-3 at 26. Given the ALJ's credibility determination in this case (*see supra* Part I.B), and the ALJ's recitation of the record evidence regarding Ewing's apparent lack of effort at

therapy, the reality that the ALJ did not explicitly note that Ewing could not hold a water bottle at an occupational therapy visit cannot show that substantial evidence was lacking to support the ALJ's RFC finding.

Moreover, even if an occupational therapist were an accepted medical source, the observation that Ewing had not met his therapy goal of being able to hold a water bottle still would not be a "medical opinion" that the ALJ would have been required to address.   Pursuant to the applicable regulations, "[a] medical opinion is a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions in" the abilities to "perform physical demands of work activities," "perform mental demands of work activities," "perform other demands of work," and "adapt to environmental conditions."  20 C.F.R. § 404.1513(a)(2).  On the other hand, "objective medical evidence" is defined as "medical signs, laboratory findings, or both," and "other medical evidence" is defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."  20 C.F.R. § 404.1513(a)(1), (3).  Johnson's notation—in the form of an unchecked box—that Ewing had not met his goal of being able to hold a water bottle relates more to medical signs or judgments about the nature and

severity of Ewing's impairments and his prognosis than to his ability to perform work activities, and consequently falls under the definitions for objective medical evidence and other medical evidence, not a medical opinion. *See* 20 C.F.R. § 404.1513(a)(1)–(3). Accordingly, the evidence from Ewing's occupational therapist did not constitute medical opinion evidence, and the ALJ properly considered those records.

In short, the ALJ's decision shows that, for several, separate and independent reasons, the ALJ properly considered evidence from Ewing's occupational therapy.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this March 29, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE